LEIGH M. CLARK, Retired Circuit Judge.
A jury found defendant (appellant) guilty of robbery. The court fixed his punishment at imprisonment for twenty years and one day and sentenced him accordingly.
Wendell Jacobs, the alleged victim and the operator of a service station and convenience store known as Key’s Corner in Tuscaloosa, testified that about 6:00 P.M. November 22, 1978, the defendant, whom he positively identified, and another “black male” succeeded in robbing him, while he was otherwise alone in the store, of “a bag of money.” He said that the other of the two men, whom he did not identify, ordered the witness at the point of a gun to open the cash register and put the money in a bag, which he did. He said that he then heard the slamming of a car door outside and immediately the men ran out of the door of the store, one right after the other; that the man other than the defendant was holding the bag of money. He testified that the two men had entered the store together. - He continued to observe them as they left the premises just before he called the police. His testimony on cross-examination continued:
“Q. Were you outside then?
“A. I was outside the front door.
“Q. And did you see either of the males at that point?
“A. They were going across the parking lot.
“Q. So you saw them then?
“A. (Witness nods head yes).
“Q. You say going across the parking lot. Which direction were they headed?
“A. Past here. These are the bays, past here, about a fifty-foot section of parking lot is where they were, and they were making a turn around the side of the parking lot going into the street when I seen them last.
“Q. Is there a street by the end of the parking lot there?
“A. Yes.
“Q. Would that be—
“A. 11th Avenue.
“Q. You saw them turn on that?
“A. Right.
“Q. How long was it after you saw the two males before the police officer returned with Mr. Martin in custody?
“A. Three or four or five minutes, it was just real quick.
“Q. Where was Mr. Martin when you saw him?
*1087 “A. In the police car.
“Q. Was he still in the car when you identified him?
“A. Yes, sir.”
According to further testimony of the witness, defendant was wearing a big hat that was marked as State’s Exhibit No. 2 “or one identical to it” and an “old Air Force fatigue jacket.”
The identification of defendant by Mr. Jacobs was corroborated by the testimony of Mr. O. M. Cummings, Jr., as one of the two men who ran from the store, one with a bag in his hand. He said he was present at the store when the officers soon thereafter brought the defendant to the store. In answer to the question whether in his judgment the man they picked up was the same man that he had seen come running out of the store, he said, “It looked mighty like him to me.”
According to the testimony of Officer N. E. Willingham, he received a radio dispatch to proceed to Key’s Corner at Tenth Street and Tenth Avenue soon after the robbery occurred. He left his partner there and proceeded in his police automobile in the direction he learned the robbers had taken in leaving the store and the parking lot and stopped the automobile at the intersection of Eighth Street and Thirteenth Avenue, with no lights on the automobile while parked. He had obtained a description of the robbers. “Two black males came walking out of the alleyway, walking fast, walking side by side.” He stepped out of the automobile, identified himself and told the men to stop. They then “just split up and started walking fast,” and soon “started running.” He “picked out one of them, the one closest to him” and “started running after him.” He told the man that “if he didn’t stop, I was going to shoot him.” The man slowed down, and the officer caught him. He was the defendant. The other man escaped. It only took about three minutes for the officer to leave the store, arrest the defendant, and return to the store. He there delivered him into the hands of other officers. Defendant did not have on a hat or cap.
According to the testimony of Sgt. Billy Bigham, he arrived at Key’s Corner just after defendant had been arrested. He patrolled around the area in his car and located “in Tenth Street, on the corner of Eleventh Avenue,” what he called “a cap,” the kind of headpiece that was also referred to as “a hat” that became State’s Exhibit No. 2 in the case.
Constable Joe Perkins testified that at about ten minutes after seven on the night of defendant’s arrest he showed the defendant the headpiece referred to as “a cap” and “a hat,” which constituted State’s Exhibit No. 2, and defendant said “that that was his hat, that he had bought several of them in California.”
According to the testimony of defendant, he was not present at the time and place of the robbery and did not know anything about it. He lived at 703 Thirty-fourth Avenue in Tuscaloosa. On November 22, 1978, he worked the early morning hours, went to his home afterwards, and visited several friends that afternoon. He was walking alone when apprehended by Officer Willingham. He saw another person about that time, the person that fled, but he did know him. He told Officer Willingham that he was just coming from a friend’s house. He said he had a hair net over his head, but that otherwise he had on no hat or cap and that he told the officers that the hat or cap that was shown him was not his.
Appellant’s only assertion of error is that “the trial court erred in denying appellant’s motion for mistrial and motion for new trial.” Each motion was grounded on the allegedly improper and prejudicial questions the prosecuting attorney asked defendant on cross-examination. We now set forth the part of the cross-examination of defendant that forms the basis of appellant’s assertion of error in his statement that the court “erred in overruling defendant’s motion for a mistrial and his motion for a new trial”:
“Q. Did he [Officer Willingham] ask you the address of the friend girl’s house?
"A. No.
*1088 “Q. Now, do you recall when he read you your rights?
“A. The only time he was reading them to me was at the service station.
“Q. Now, you know what rights are, don’t you? You’ve heard them before, haven’t you?
“A. Well, I’ve heard them before.
“Q. You know, you know when they’re supposed to be given, too, don’t you, George?
“A. No, I really couldn’t say. I don’t know about no police routine, what they go through.
“Q. You don’t know anything about police routine?
“A. I don’t know.
“MR. CORNWELL: Your Honor, we object to this.
“THE COURT: Let’s move on, gentlemen.
“Q. Did he read you your rights when he first got you there in the car, George?
“A. I don’t recall.
“Q. Did he read you any rights while he was driving the car?
“A. I don’t recall.

“Q. They took you out of the marked car and put in a detective’s car?
“A. Well, first they took me out of that car and read my rights to me at the service station. I’m not sure whether I was in the marked car when they read me my rights or not. But anyway they transferred me to another car, and that’s when the man came up with the cap.
“Q. You’re doing all this talking to this officer, George, without any rights being read to you, is that right?
“A. No, sir, I was telling him — yeah, darn right, I was telling him that I was somewhere else, that I wasn’t there.
“Q. Now, when the two people identified you, then he read you your rights, is that right?
“A. Yes, sir, the best I can recollect.
“Q. You knew what those meant, didn’t you?
“A. I could just about comprehend what they meant.

“Q. Now, tell me what happened up at the station about the cap. Did anything else happen up at the station about this cap right here?
“A. Yeah, I was — the detective was reading my rights again, and I answered ‘Yes,’ to that.
“Q. You answered yes to what?
“A. Did I understand what he was reading my rights about and that’s when he said, well—
“Q. There was no question about you understanding your rights. How many times had you ever heard rights read to you, George?
“MR. CORNWELL: We object to this.
“THE COURT: Let’s stick with this case.
“MR. WILLIAMS: Okay.
“THE COURT: I sustain.

“A. They told me, I said — they said, ‘Do you want to call a lawyer,’ and I said, ‘Yeah,’ and they said ‘Can you afford a lawyer,’ and I said, ‘No.’ He said, ‘I’m going to have to ask you some questions anyway.’
“Q. And that’s what happened up in that police station in the Detective Division.
“A. Yes, sir.
“Q. They didn’t say anything about the public defender?
“A. I even asked them about that and they said, ‘Well, we can’t get in touch with them.’
“Q. Alright [sic]. Then you already knew about the public defender?
“A. Well, I—
“MR. CORNWELL: Your Honor, may we approach the bench?
“THE COURT: Well, I sustain the objection to that question. Let’s move on, gentlemen.
“MR. WILLIAMS: Okay.
“Q. What was said about the cap after you asked for a lawyer and they wouldn’t let you have one, and they took a statement from you?
*1089 “A. He kept on saying about seven something, seven: 10 or something like that. He said I said, ‘This is my cap,’ and I said, ‘no, I did not say that.’ ”
The above includes all of the cross-examination reported in appellant’s brief.
We fully understand appellant’s feeling to the effect that it appears that counsel for the State was endeavoring to show defendant’s familiarity with the rights of one suspected or accused of a crime, and details of the usual procedure of officers before asking for a statement from the accused or the suspect, in order to convey to the minds of the jurors the notion that defendant had beforetime been suspected or accused of criminal conduct. If such was the purpose, the inquiry should not have been conducted; it would have been an abuse of the right of cross-examination. The material quoted above furnishes some support for appellant’s contention, but our consideration of the entire cross-examination, which was extraordinarily and probably unnecessarily lengthy, leads us to the view that the jury did not believe that defendant had a previous criminal record.
We do not agree with appellant’s characterization of the court’s statement in sustaining an objection of defendant, “Let’s stick with this case,” as an “injudicious and prejudicial comment.” There was a note of reproof in it, but reproof of no one other than counsel for the State. The record does not show, and could hardly show, any emphasis upon the word “this.” To conclude that the jury was led to believe that defendant had or had had other cases requires us to go beyond that which the record permits. Our conclusion is that the trial judge was not in error, either in denying defendant’s motion for a mistrial or in overruling his motion for a new trial.
We find no error in the record prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.